# In the United States Court of Federal Claims

No. 15-577C
Filed: February 28, 2017

*******************************************
| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, * | Damages for Partial Breach of Contract; |
| Plaintiff, * | Federal Rule of Evidence 702 (Experts); |
| v. * | Nuclear Waste Policy Act, 42 U.S.C. §§ 10101–10270; |
| UNITED STATES, * | Waste Classification, 10 C.F.R. 61.55; |
| Defendant. * | Licensing Requirements for Independent Storage of Spent Nuclear Fuel, 10 C.F.R. 72; |
| | Standard Contract for Disposal of Spent Nuclear Fuel, 10 C.F.R. 961.11. |

*******************************************

**Timothy R. Macdonald**, Arnold & Porter, LLP, Denver, Colorado, Counsel for the Plaintiff.

**Christopher K. Wimbush**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## POST TRIAL MEMORANDUM OPINION AND FINAL ORDER

**BRADEN**, *Judge*.

On June 14, 1983, Sacramento Municipal Utility District ("SMUD") and other nuclear-utility plants entered into a Standard Contract, 10 C.F.R. 961.11 (1983), with the Department of Energy ("DOE"), as required by the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101–10270. Under the June 14, 1983 Standard Contract, the DOE had a legal obligation to begin disposing of SMUD's spent nuclear fuel ("SNF") and high-level waste ("HLW") on, or before, January 31, 1998. *See* 42 U.S.C. § 10222(a)(5)(B). The DOE, however, did not commence performance on that date and has not done so, to date.

Seventeen years ago, the United States Court of Appeals for the Federal Circuit held that DOE's failure to begin disposing of the nuclear utilities' SNF and HLW by January 31, 1998 was a partial breach of the Standard Contract. *See Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342–43 (Fed. Cir. 2000). This Memorandum Opinion and Final Order adjudicates

SMUD's June 8, 2015 Complaint, alleging that SMUD is entitled to damages for mitigation costs incurred from January 1, 2010 to June 30, 2015.[1]

To facilitate review of this Post Trial Memorandum Opinion And Final Order, the court has provided the following outline:

**I.  FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY.**

  **A.  *Sacramento Municipal Utility District v. United States*, Civil Action Docket No. 98-488C.**

  **B.  *Sacramento Municipal Utility District v. United States*, Civil Action Docket No. 09-587C.**

  **C.  *Sacramento Municipal Utility District v. United States*, Civil Action Docket No. 15-577C.**

**II.  DISCUSSION.**

  **A.  Jurisdiction.**

  **B.  Standing.**

  **C.  Whether DOE Partially Breached The June 14, 1983 Standard Contract.**

  **D.  The Mitigation Costs That SMUD Is Entitled To As Damages, Because Of DOE's Partial Breach Of The June 14, 1983 Standard Contract.**

    **1.  Whether SMUD Is Entitled To Recover Costs Incurred To Maintain And Operate The T&R Building And PAP Building.**

      **a.  SMUD's Argument.**

      **b.  The Government's Response.**

      **c.  SMUD's Reply.**

      **d.  The Court's Resolution.**

    **2.  Whether SMUD Is Entitled To Recover Costs Incurred For Site Consolidation, Upgrades To The PAP Building's Water And Septic Systems, And Planning To Replace The ISFSI Backup Generator.**

      **a.  SMUD's Argument.**

      **b.  The Government's Response.**

      **c.  SMUD's Reply.**

      **d.  The Court's Resolution.**

    **3.  Whether SMUD Is Entitled To Recover Costs Incurred To Replace The HVAC Unit And Install New Carpet In The PAP Building.**

      **a.  SMUD's Argument.**

---

[1] This is the third lawsuit that SMUD files against the United States for damages resulting from DOE's ongoing failure to perform its contractual duty.

       **b.**   **The Government's Response.**

       **c.**   **SMUD's Reply.**

       **d.**   **The Court's Resolution.**

  **4.**   **Whether SMUD Is Entitled To Recover Costs Incurred To Replace The ISFSI Backup Generator And Refurbish Parts Of Rancho Seco's Electrical Infrastructure.**

       **a.**   **SMUD's Argument.**

       **b.**   **The Government's Response.**

       **c.**   **SMUD's Reply.**

       **d.**   **The Court's Resolution.**

  **5.**   **Whether SMUD Is Entitled To Recover Costs Incurred For Operating, Maintaining And Repairing The IOSB And For Refurbishing Fuel Handling Equipment Stored In The IOSB.**

       **a.**   **SMUD's Argument.**

       **b.**   **The Government's Response.**

       **c.**   **SMUD's Reply.**

       **d.**   **The Court's Resolution.**

  **6.**   **Whether SMUD Is Entitled To Recover Brokerage Fees Incurred To Obtain ANI Insurance.**

       **a.**   **SMUD's Argument.**

       **b.**   **The Government's Response.**

       **c.**   **SMUD's Reply.**

       **d.**   **The Court's Resolution.**

  **7.**   **Whether The Government Is Entitled To An Offset For Certain ANI Insurance Refunds That SMUD Received.**

       **a.**   **SMUD's Argument.**

       **b.**   **The Government's Response.**

       **c.**   **SMUD's Reply.**

       **d.**   **The Court's Resolution.**

**III.  CONCLUSION.**

I.      **FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY.**

    A.      ***Sacramento Municipal Utility District v. United States*, Civil Action Docket No. 98-488C.[2]**

    SMUD is a publicly-owned municipal utility district established under the laws of California.  *See SMUD III*, 70 Fed. Cl. at 339.  On June 14, 1983, SMUD and other nuclear-utility plants entered into a contract (the "Standard Contract") with DOE, pursuant to the NWPA.  Under the Standard Contract, DOE was legally obligated to begin disposing and storing SMUD's SNF and HLW, by January 31, 1998, and to continue to do so until disposal was complete.  *See* 42 U.S.C. § 10222(a)(5)(B).  In exchange for DOE's disposal and storage services, SMUD paid fees to the Nuclear Waste Fund.  *See* 42 U.S.C. § 10222(a)(5)(B).

    During the 1980's, SMUD operated the Rancho Seco Nuclear Generating Station ("Rancho Seco"), a nuclear power plant located in Sacramento, California.  *See SMUD III*, 70 Fed. Cl. at 339.  Throughout that time, however, Rancho Seco experienced significant operating problems and extended outages.  *Id*. at 340.  In fact, the plant worked at full capacity for less than half of its operating life.  *Id*.  For this and other reasons, on June 6, 1989, the voters of Sacramento chose to shut down Rancho Seco.  *Id*.  Immediately thereafter, SMUD began preparing for the plant's decommissioning process.[3]  *Id*.  To that end, SMUD evaluated storage options for Rancho Seco's

---

    [2] The following Memorandum Opinions and Orders were issued in Civil Action Docket No. 98-488C: *Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438 (2004) ("*SMUD I*") (denying the Government's motion to dismiss SMUD's takings claim and dismissing SMUD's illegal exaction claim); *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495 (2005) ("*SMUD II*") (determining that DOE was liable for a partial breach of the Standard Contract when it failed to begin to dispose of SMUD's SNF by January 31, 1998); *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332 (2006) ("*SMUD III*") (determining that SMUD was entitled to mitigation damages for certain costs incurred as a result of DOE's partial breach of the Standard Contract); *Sacramento Mun. Util. Dist. v. United States*, 74 Fed. Cl. 727 (2006) ("*SMUD IV*") (determining that SMUD was entitled to an award of $39,796,234 in mitigation costs caused by DOE's partial breach of the Standard Contract); *Sacramento Mun. Util. Dist. v. United States*, 293 F. App'x 766 (Fed. Cir. 2008) (unpublished) ("*SMUD V*") (affirming-in-part *SMUD II–IV* and remanding for the trial court to determine causation, in light of the 1987 Annual Capacity Report, and to determine other mitigation costs); *Sacramento Mun. Util. Dist. v. United States*, 91 Fed. Cl. 9 (2009) ( "*SMUD VI*") (on remand determining that SMUD was entitled to mitigation costs of $53,159,863, but staying entry of a final judgment, pending resolution of a related case, Docket No. 09–587C); *In re Sacramento Mun. Util. Dist.*, 395 F. App'x 684, 688 (Fed. Cir. 2010) (unpublished) (denying petition for a writ of mandamus to United States Court of Federal Claims to lift stay on judgment).

    [3] "Decommission means to remove a facility or site safely from service and reduce residual radioactivity to a level that permits . . . (1) Release of the property for unrestricted use and termination of the [United States Nuclear Regulatory Commission ("NRC")] license; or (2) Release of the property under restricted conditions and termination of the license." 10 C.F.R. 50.2.

SNF and, on March 30, 1990, decided to move all of the plant's SNF from wet-pools, where it was being stored, to a "dual purpose" dry storage facility.[4]  *Id.*  at 341–42.

DOE did not begin to dispose of SMUD's SNF and HLW by January 31, 1998, as required by the Standard Contract.[5]  *Id.* at 353.  Accordingly, on June 9, 1998, SMUD filed a Complaint ("6/9/1998 Compl.") in Civil Action Docket No. 98-488C, alleging that DOE's failure to begin storing and disposing of SMUD's SNF breached the Standard Contract.  6/9/1998 Compl. at ¶ 1.  SMUD sought mitigation damages for a period that eventually spanned from January 1, 1992 to December 31, 2003.  *See SMUD III*, 70 Fed. Cl. at 356.

On August 31, 2000, the United States Court of Appeals for the Federal Circuit held that DOE breached the Standard Contract in a related case, because DOE did not meet its contractual obligation to begin accepting nuclear waste before January 31, 1998.  *See Maine Yankee Atomic Power*, 225 F.3d at 1343.  On January 19, 2005, the United States Court of Federal Claims determined that DOE breached the Standard Contract, because *Maine Yankee Atomic Power* "settled the legal issue of whether [DOE's] failure to begin accepting nuclear waste by January 31, 1998, constituted a breach . . . [.]"  *SMUD II*, 63 Fed. Cl. at 502–03.

On March 31, 2006, the court also determined that SMUD was entitled to damages for certain costs incurred from May 15, 1997 to December 31, 2003.  *See SMUD III*, 70 Fed. Cl. at 332.  Specifically, the court found that SMUD was entitled to recover costs for:

- dry storage of SNF, *id.* at 367;

- labor severance and recruiting, *id.* 369;

- delays to complete the Independent Spent Fuel Storage Installation ("ISFSI"),[6] required to implement dry storage of SNF, *id.*;

- storing failed SNF, *id.* at 370;

---

[4] Dry cask storage is a method for storing spent nuclear fuel after it has cooled for at least one year.  *See* UNITED STATES NUCLEAR REGULATORY COMMISSION GLOSSARY, https://www.nrc.gov/ reading-rm/basic-ref/glossary/dry-cask-storage.html (last visited Feb. 23, 2017).  The fuel is sealed in casks that are welded or bolted closed and surrounded by steel, concrete, lead, or other material to provide leak-tight containment and radiation shielding.  *See id.*  Dual-purpose canisters are designed for dry storage, but also allow SNF to be transported within a cask unit to a disposal site.  *See SMUD III*, 70 Fed. Cl. at 341 n.11.

[5] To date, DOE has not disposed of or stored any of SMUD's SNF or HLW.  Answer at ¶ 22, *Sacramento Municipal Utility District v. United States*, No. 15-577 (Fed. Cl. July 30, 2015), ECF No. 7 ("Admits the allegation . . . that the DOE did not begin disposing of SNF and HLW from commercial nuclear utilities, including SMUD, by January 31, 1998, under the standard contract, and has yet to do so.").

[6] An ISFI is a "complex designed and constructed for the interim storage of spent nuclear fuel . . . and other radioactive materials associated with spent fuel[.]"  10 C.F.R. 72.3.

- operation and maintenance of the ISFSI, *id*. at 371;

- preparation, packaging, inspection, and loading of SNF, *id*. at 373.

But, the court determined that SMUD was not entitled to recover costs related to:

- SMUD's decision to store SNF in dual purpose transportable casks, *id*. at 374;

- contracts, or other legal obligations, related to the dry storage project that SMUD incurred prior to May 15, 1997, *id*.;

- storage of Greater Than Class C ("GTCC") waste,[7] *id*.;

- savings accrued when SMUD transferred the Rancho Seco SNF from wet-pool storage to dry storage, *id*. at 375;

- internal labor, except for work performed on the dry storage project, *id*. at 376;

- overhead costs, *id*. at 377;

- on-site drop testing, *id*. at 378.

On March 31, 2006, the court also entered an Order Requesting Supplemental Expert Testimony, because the court could not ascertain SMUD's damages with reasonable certainty based on the record. Order Requesting Supplemental Expert Testimony at 1, *Sacramento Municipal Utility District v. United States*, No. 98-488C (Fed. Cl. Mar. 31, 2006), ECF No. 354. Thereafter, the parties supplemented the record and, on December 1, 2006, the court determined that SMUD was entitled to an award of $39,796,234. *See SMUD IV*, 74 Fed. Cl. at 735. Thereafter, SMUD and the Government filed cross-appeals.[8]

On August 7, 2008, the United States Court of Appeals for the Federal Circuit held that "the Standard Contract [required] the [DOE] to accept SNF and HLW in accordance with the 1987 annual capacity report ["ACR"]." *SMUD V*, 293 F. App'x at 771. That appellate court also held that the United States Court of Federal Claims erred in granting the Government offsets for costs related to internal labor, dual-purpose caskets, and nonfuel storage, in the amount of $13,363,629. *Id*. at 773–75. Accordingly, Civil Action Docket No. 98-488C was remanded, with instructions that the trial court apply the 1987 ACR acceptance rate to assess causation and correct its offset determinations. *See id*. at 772.

On remand, the court applied the 1987 ACR acceptance rate and determined that SMUD was entitled to $39,796,234 in mitigation costs. *See SMUD VI*, 91 Fed. Cl. at 18. Moreover, in

---

[7] GTCC waste means "low-level radioactive waste that exceeds the concentration limits of radionuclides established for Class C waste in [10 C.F.R.] 61.55[.]" 10 C.F.R. 72.3.

[8] In *SMUD III*, the court found that the parties' evidence regarding the Standard Contract's acceptance rate, *i.e.* the rate at which DOE was obligated to accept SNF from SMUD, was highly speculative. *See SMUD III*, 70 Fed. Cl. at 375 n.40. For this reason, the court declined to determine an acceptance rate. *Id*.

light of the appellate court's holding that the Government should not receive offsets related to internal labor, dual-purpose caskets and nonfuel storage, the court determined that SMUD was entitled to an additional $13,363,629.  *Id*.  Finally, the court denied the Government's request for an offset related to savings that SMUD allegedly realized between 2004 and 2008.  *Id*. at 19.  The court found that, on September 4, 2009, SMUD filed a Complaint in Civil Action Docket No. 09-587C, seeking damages from January 1, 2004 onward and determined that any offset realized after January 1, 2004, therefore, should be adjudicated in that case.  *Id*. at 19.  The court, however, stayed judgment in Civil Action Docket No. 98-488C, pending the court's resolution of Civil Action Docket No. 09-587C.  *Id*.

On March 12, 2010, SMUD filed a Petition For A Writ Of Mandamus, requesting that the United States Court of Appeals for the Federal Circuit order the court to lift the stay in Civil Action Docket No. 98–488C.  On September 16, 2010, SMUD's Petition was denied.  *See In re Sacramento Mun. Util. Dist.*, 395 F. App'x at 688.

**B.**     ***Sacramento Municipal Utility District v. United States*, Civil Action Docket No. 09-587C.**

On September 4, 2009, SMUD filed a Complaint ("9/4/2009 Compl.") in Civil Action Docket No. 09-587C alleging that, "[a]s a direct and proximate result of the [G]overnment's partial breach of the [Standard] Contract . . . SMUD has suffered [] damages from January 1, 2004 forward, and will continue to suffer damages in the future."  9/4/2009 Compl. at ¶ 23.  On May 17, 2011, the court issued a Memorandum Opinion and Order, granting SMUD leave to supplement the September 4, 2009 Complaint to allege a claim for damages incurred through December 31, 2009.  *See Sacramento Mun. Util. Dist. v. United States*, 98 Fed. Cl. 495, 499 (2011) ("*SMUD VII*").

From October 24, 2011 to October 27, 2011, the court held a trial in Washington, D.C., to adjudicate the amount of damages that SMUD was entitled to recover for the period from January 1, 2004 to December 31, 2009.  On January 31, 2013, the court issued a Memorandum Opinion and Final Order in Civil Action Docket No. 09-587C, determining that SMUD was entitled to $53,159,863 for costs incurred to mitigate the Government's partial breach of the Standard Contract from 1992 to 2003, plus $20,703,595 for costs incurred from 2004 to 2009.  *See Sacramento Mun. Util. Dist. v. United States*, 109 Fed. Cl. 660, 708 (2013) ("*SMUD VIII*").  The court also determined that the Government was entitled to an offset of $34,987,913 for wet pool costs that SMUD avoided from 2004 to 2008.  *Id*.  Accordingly, the court awarded SMUD a total of $38,845,398 for the period between 1992 and 2009.  *Id*.  The parties filed cross-appeals.

On June 20, 2014, the United States Court of Appeals for the Federal Circuit held that  the United States Court of Federal Claims erred by applying an offset for the 2004–2009 damages period, to an earlier final judgment for the 1992–2003 damages period.  *See Sacramento Mun. Util. Dist. v. United States*, 566 F. App'x 985, 997 (Fed. Cir. 2014) (unpublished) ("*SMUD IX*").  Accordingly, the appellate court reversed the combined judgment of $38,845,398 for the 1992–2009 period and reinstated the prior $53,159,863 award for mitigation costs incurred between 1992 and 2003.  *Id*. at 986.  Moreover, the appellate court vacated the damages award for 2004 to 2009 and remanded the case to the trial court for consideration of SMUD's argument that, in light of the

Standard Contract's "Exchanges" provision, SMUD's SNF would have been entirely removed before January 1, 2004, in the non-breach world.[9]

On remand, the court determined that, in the non-breach world, DOE would have removed all of Rancho Seco's SNF by January 1, 2004. *See Sacramento Mun. Util. Dist. v. United States*, 120 Fed. Cl. 278, 279 (2015) ("*SMUD X*"). And, SMUD was entitled to $20,703,595 in mitigation costs for the period between January 1, 2004 and December 31, 2009. *Id*. at 282. In addition, the court awarded SMUD an additional $1,816,964 for various other fees. *Id*.

## C.   *Sacramento Municipal Utility District v. United States*, Civil Action Docket No. 15-577C.[10]

On June 8, 2015, SMUD filed a Complaint in the United States Court of Federal Claims in this case, Civil Action Docket No. 15-577C, alleging a partial breach of the Standard Contract (6/8/2015 Compl. at ¶ 28) and seeking "damages incurred beginning January 1, 2010 and continuing through a date prior to trial, at least through June 1, 2015." 6/8/2015 Compl. at ¶ 13. On July 30, 2015, the Government filed an Answer (7/30/2015 Answer). ECF No. 7.

On September 21, 2015, the parties filed a Joint Preliminary Status Report, proposing two different discovery schedules. ECF No. 8. On October 5, 2015, the court convened a Status Conference to discuss a schedule acceptable to both parties. ECF No. 10. On October 28, 2015, the court issued a Scheduling Order, that set the close of fact discovery for June 17, 2016 and a trial date for October 2016. ECF No. 11.

On April 5, 2016, the Government filed a Motion To Extend Discovery And Stay Certain Deadlines, that SMUD opposed. ECF No. 15. On April 13, 2016, the court convened a Status Conference to address the April 5, 2016 Motion. ECF No. 17. On April 18, 2016, the court issued an Amended Scheduling Order, denying the Government's request to stay certain deadlines, but extending discovery until July 18, 2016. ECF No. 18. The court also scheduled trial for October 4–6, 2016, in Washington, D.C. ECF No. 18.

On July 29, 2016, SMUD submitted a Witness List and Exhibit List. ECF Nos. 22–23. On that same day, SMUD filed a Memorandum Of Contentions Of Fact And Law, to advise the court that SMUD claimed $29,555,559 in damages, of which the Government did not dispute $22,508,343. ECF No. 24. SMUD also filed a Motion For Partial Summary Judgment, pursuant

---

[9] The "Exchanges" provision gave utilities the option to exchange or swap acceptance slots to adjust delivery schedules, subject to the approval of DOE. *See SMUD IX*, 566 F. App'x at 987.

[10] The underlying facts in Docket No. 15-577C were set forth in *SMUD III*, *SMUD IV*, *SMUD VIII*, and *SMUD X*. The relevant facts described herein were derived from: the June 8, 2015 Complaint ("6/8/2015 Compl."); the July 30, 2015 Answer ("7/30/2015 Answer"); evidence adduced at a trial that took place from October 4–5, 2016 in Washington, D.C. ("TR at 1–352"); SMUD's exhibits, introduced during trial ("PX 1–53," "PD 1–13, 101–105"); and the Government's exhibits, introduced during trial ("DX 1–73").

to Rule of the United States Court of Federal Claims ("RCFC") 56, arguing that the court should grant SMUD summary judgment as to the $22,508,343 claimed by SMUD and not disputed by the Government ("Pl. Mot."). ECF No. 25.

On August 15, 2016, the Government filed a Response to the July 29, 2016 Motion For Partial Summary Judgment, confirming that the Government did not contest $22,362,864 of the damages SMUD claimed ("Gov't Resp."). ECF No. 27. But, the Government argued that the court can only enter a partial judgment when, "an action presents more than one claim for relief." Gov't Resp. at 2. In this case, however, the disputed and undisputed damages constitute a single claim for relief. Gov't Resp. at 2. Therefore, the court is required as a matter of law, to deny the July 29, 2016 Motion For Partial Summary Judgment. Gov't Resp. at 2.

On August 15, 2016, the Government also filed a Motion To Modify the April 18, 2016 Scheduling Order. ECF No. 29. On August 19, 2016, the court denied the Government's Motion to modify the April 18, 2016 Scheduling Order. On that same day, the Government filed a Witness List, Exhibit List, and Memorandum Of Contentions Of Fact And Law. ECF Nos. 31–33.

On September 8, 2016, SMUD filed a Reply in support of its July 29, 2016 Motion For Partial Summary Judgment, arguing that the Government's definition of a "claim" is overly restrictive, elevating form over substance ("Pl. Reply"). ECF No. 37. On September 14, 2016, the Government filed an Amended Exhibit List, correcting the dates and descriptions of several exhibits. ECF No. 40.

On September 28, 2017, the court issued a Pretrial Order, instructing the parties to file the written direct examination testimony of their expert witnesses on the next day. ECF No. 41. Pursuant to the Pretrial Order, on September 29, 2016, the parties filed the written direct testimony of their experts. ECF Nos. 42–43. On September 30, 2016, SMUD filed an Amended Exhibit List and, on October 3, 2016, a Second Amended Exhibit List. ECF Nos. 44–45.

On October 4–5, 2016, the court held a trial to determine the damages that SMUD incurred between January 1, 2010 and June 31, 2016, due to DOE's ongoing partial breach of contract. ECF Nos. 52, 54. During trial, the court instructed each party to submit supplemental briefing regarding SMUD's July 29, 2016 Motion For Partial Summary Judgment. TR at 24. On October 7, 2016, the Government filed a Supplemental Brief ("Gov't Supp. Br."). ECF No. 46.

On October 11, 2016, the Government filed a Second Amended Exhibit List. ECF. No. 47. On October 19, 2016, SMUD filed a Third Amended Exhibit List. ECF No. 48. On October 20, 2016, SMUD filed a Response to the October 7, 2016 Supplemental Brief ("Pl. Supp. Br."). ECF No. 49.

On November 14, 2016, SMUD filed a Post Trial Brief ("Pl. Post Tr. Br."). ECF No. 55. And, on December 9, 2016, the Government filed a Post Trial Response Brief ("Gov't Post Tr. Resp."). ECF No. 56. On December 23, 2016, SMUD filed a Reply to the Government's December 9, 2016 Post-Trial Brief ("Pl. Post Tr. Reply"). ECF No. 57.

## II.     DISCUSSION.

### A.     Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any *express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (emphasis added). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976). To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent *contractual relationship*, constitutional provision, federal statute and/or executive agency regulation *that provides a substantive right to money damages*. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (emphasis added). In a breach of contract case, "the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

In this case, the June 8, 2015 Complaint alleges that: (1) SMUD entered into an express contract with DOE on June 14, 1983; (2) DOE breached, and continues to breach, the June 14, 1983 Contract; and (3) SMUD is entitled to damages for the ongoing breach. 6/8/2015 Compl. at ¶¶ 1, 13, 28. Because SMUD's claims are based on the alleged breach of a contractual relationship with the Government, the court has determined that it has jurisdiction to adjudicate those claims. *See Holmes*, 657 F.3d at 1314.

### B.     Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit[.]" *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5, (1992)). "The party invoking federal jurisdiction bears the burden of establishing [standing]." *Lujan*, 504 U.S. at 561.

To establish standing to sue the Government for breach of contract, a plaintiff must demonstrate privity of contract with the Government. *See Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003) ("To have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States."). In other words, the contract in question must be between the plaintiff and the Government. *See Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the [G]overnment.").

In this case, it is undisputed that SMUD was a signatory and intended beneficiary of the June 14, 1983 Standard Contract. 7/30/2015 Answer at ¶ 1 ("[The Government] [a]dmits that in 1983, SMUD entered into a standard contract . . . for the disposal of [SNF] and/or [HLW], by

[DOE].”).   Therefore, the court has determined that SMUD is in privity of contract with the Government.   Accordingly, SMUD has standing to pursue the breach of contract claim alleged in the June 8, 2015 Complaint.

### C.     Whether DOE Partially Breached The June 14, 1983 Standard Contract.

"Failure to perform a contractual duty when it is due is a breach of the contract." *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995), *aff'd* 518 U.S. 839 (1996).   The United States Court of Appeals for the Federal Circuit has held that the Standard Contract that DOE entered into with SMUD and other nuclear-utility plants, under the NWPA, required DOE to "dispose of the [plants' SNF and HLW] beginning no later than January 31, 1998." *Maine Yankee Atomic Power*, 225 F.3d at 1337 (internal quotation marks omitted).   In this case, the parties do not dispute that, to date, "DOE has failed to begin disposing of SNF" and that, "SMUD [has] paid all required fees on time and in full."   7/30/2015 Answer at ¶ 2.   Therefore, the court has determined that DOE partially breached the June 14, 1983 Standard Contract.   *Cf. Maine Yankee Atomic Power*, 225 F.3d at 1343 ("[T]he parties do not dispute that [plaintiff] has paid all the contract fees and . . . that DOE has not begun accepting, transporting, and disposing of [plaintiff's] SNF.   Accordingly, DOE has breached the contract." (internal quotation marks omitted)).

### D.     The Mitigation Costs That SMUD Is Entitled To As Damages, Because Of DOE's Partial Breach Of The June 14, 1983 Standard Contract.

In a suit for partial breach of contract, a plaintiff may recover damages that it already incurred.   *See Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1376 (Fed. Cir. 2005) ("[A] claimant may not recover . . . prospective damages for anticipated future nonperformance resulting from the same partial breach.").   Breach of contract damages must be "sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Id.* at 1373.   But, "[the] non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003).

Breach of contract damages are "recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages;[11] and (3) the damages are shown with reasonable certainty." *Ind. Mich. Power Co.*, 422 F.3d at 1373.   The plaintiff must establish each element by a preponderance of the evidence.   *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002).   If damages are hard to estimate, however, "the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003).

---

[11] The United States Court of Appeals for the Federal Circuit prefers the "but for" causation test—whether the breach of contract was the but-for cause of plaintiff's damages—over the "substantial factor" causation test—whether the breach was a substantial factor in causing plaintiff's damages.   *See Yankee Atomic*, 536 F.3d at 1272.   Nonetheless, the appellate court has refrained "from reversing trial courts that [apply] the substantial factor test in . . . SNF cases." *Id.*

To assess damages in cases arising out of DOE's partial breach of the Standard Contract, the court must perform a "comparison between the breach and non-breach worlds." *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (2008). As part of this comparison, the Government "must move forward by pointing out the costs it believes the [nuclear utility] plaintiff avoided because of [DOE's] breach[.]" *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011). The nuclear utility-party, however, bears the burden of persuasion with respect both to claimed costs and avoided costs. *Id.* Therefore, "a plaintiff seeking damages must submit a hypothetical model establishing what its costs would have been in the absence of breach." *Energy Nw. v. United States*, 641 F.3d 1300, 1305 (Fed. Cir. 2011); *see also S. Nuclear*, 637 F.3d at 1304 ("[B]ecause plaintiffs . . . are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world.") (quoting *Yankee Atomic*, 536 F.3d at 1273) (internal quotation marks omitted)).

"If a cost would have been incurred even in the non-breach world, it is not recoverable." *Energy Nw.*, 641 F.3d at 1307. Likewise, a cost that would have been incurred in the non-breach world, but was not incurred in the actual world—*i.e.*, an avoided cost—must be offset against a plaintiff's recovery. *See Carolina Power & Light Co. v. United States*, 573 F.3d 1271, 1277 (Fed. Cir. 2009) (differentiating between "avoided" and "deferred" costs).

In this case, SMUD seeks $29,549,558 in damages for mitigation costs incurred from January 1, 2010 to June 30, 2015, caused by DOE's ongoing breach of the Standard Contract. Pl. Post Tr. Br. at 1. The Government objects only to $7,041,215 of that amount, because SMUD did not carry its burden to establish, by a preponderance of the evidence, that SMUD is entitled to costs associated with:

- maintenance of the Training and Records (T&R),[12] and Personnel Access Portal ("PAP")[13] buildings;

- site consolidation, upgrades to the PAP building's water and septic systems, and planning to replace the ISFSI backup generator;

- replacing the PAP building's heating, ventilation and air-conditioning ("HVAC"), and carpets;

- replacing the ISFSI's backup generator, and refurbishing certain parts of Rancho Seco's electrical infrastructure;

---

[12] The T&R building, a five-story building constructed in the 1980s, housed offices for three Rancho Seco staff members and twenty security guards. TR at 64–65 (Testimony of Mr. Einar Ronningen).

[13] The PAP building was "repurposed from an existing security building to become the main office building, providing work space for all on-site non-security personnel, support space for the on-site security personnel, as well as a location for a qualified vault for site records." PX 52 at 25 (Written Direct Testimony of Mr. Kenneth P. Metcalfe).

- maintenance of the Interim Onsite Storage Building ("IOSB")[14] and refurbishing the fuel handling equipment stored in the IOSB;

- American Nuclear Insurers ("ANI") insurance brokerage fees; and

- ANI Premium Costs.

Gov't Post Tr. Br. at 9, 18, 20, 24.

### 1.    Whether SMUD Is Entitled To Recover Costs Incurred To Maintain And Operate The T&R Building And PAP Building.

#### a.    SMUD's Argument.

SMUD argues that it is entitled to recover $3,685,112 for maintenance of the T&R and PAP buildings from 2010 to 2015, because these costs are attributable to the presence of SNF at Rancho Seco. Pl. Post Tr. Br. at 6–7. The court has determined in prior litigation that, in the non-breach world, DOE would have removed all of SMUD's SNF by 2004 and SMUD would have completely exited the nuclear industry by 2009. Pl. Post Tr. Br. at 2. For these reasons, the court awarded SMUD maintenance and operations costs in Civil Action Docket No. 09-587C, and should do so again in this case. Pl. Post Tr. Br. at 6.

The evidence adduced at trial proves that SMUD's site operations costs are attributable to DOE's ongoing failure to remove Rancho Seco's SNF. Pl. Post Tr. Br. at 7. Mr. Ronningen[15] testified that SMUD's site operations costs were related to operating and maintaining facilities used by personnel that support SNF storage. Pl. Post Tr. Br. at 8. These costs were "required because of the presence of the spent nuclear fuel and the staff [at Rancho Seco] safely managing it." Pl. Post Tr. Br. at 7 (quoting TR at 61–62, 85 (Ronningen)).

At trial, the Government did not refute Mr. Ronningen's testimony. In fact, the Government's expert witness, Mr. Warren Brewer,[16] agreed that it is necessary to have security

---

[14] "[T]he IOSB was used to store contaminated spent fuel handling equipment, which SMUD maintains for use in ongoing spent fuel transfer campaigns, and which SMUD intends to use to move spent fuel during SMUD's Part 72 relicensing process, if necessary." PX 52 at 22–23 (Metcalfe). Moreover, SMUD stored Class B and Class C waste in the IOSB until 2014. PX 52 at 23 (Metcalfe).

[15] Mr. Einar Ronningen is SMUD's senior representative at the Rancho Seco site. TR at 41. In that capacity, he is responsible for the safe storage of spent nuclear fuel. TR at 41 (Ronningen).

[16] Mr. Warren Keith Brewer is the President of ABZ, Incorporated, an engineering consulting company. TR at 232. Mr. Brewer has a Bachelor of Science degree in electrical engineering from Louisiana Tech University and a Masters of Science degree in nuclear engineering from the Massachusetts Institute of Technology. TR at 233. In addition, Mr. Brewer has taken graduate-level courses at the Bettis Reactor Engineering School. TR at 233. Mr. Brewer

personnel and management employees to guard and manage the SNF stored at Rancho Seco, and they need office space that must be maintained. TR at 243 (Brewer). Mr. Brewer also agreed that the costs of maintaining the nuclear records vault and the security gate at the entrance of the Rancho Seco site are attributable to the presence of SNF. TR at 246–47 (Brewer).

### b.   The Government's Response.

The Government challenges $3,663,129 of the costs claimed by SMUD for maintenance and operation of the T&R building and PAP building, because those facilities support personnel that perform non-nuclear activities at Rancho Seco. Gov't Post Tr. Br. at 9–10. Therefore, the maintenance of these buildings is not related to DOE's partial breach of the Standard Contract. Gov't Post Tr. Br. at 9. In addition, SMUD did not "prove the extent to which [its] incurred costs differ from the costs [it] would have incurred in the non-breach world," because SMUD failed to present evidence of what its maintenance and operations costs would have been if DOE performed on the Standard Contract. Gov't Post Tr. Br. at 11 (citing *Energy Nw.*, 641 F.3d at 1306). Mr. Ronningen testified that SMUD's claim includes costs that "he determined had any connection, either directly or indirectly, to the presence of [SNF at Rancho Seco]." Gov't Post Tr. Br. at 12. But, Mr. Ronningen failed to consider whether costs for the same or similar activities would have been incurred if DOE had disposed of SMUD's SNF by 2004. Gov't Post Tr. Br. at 12.

Moreover, to the extent that SMUD argues that "it has satisfied its causation burden because . . . no buildings or personnel would be located at the Rancho Seco Industrial Facility in the non-breach world, its argument conflicts with SMUD's continued [use] of the site for non-SNF-related activities." Gov't Post Tr. Resp. at 14. As Mr. Ronningen testified, in the non-breach world, SMUD's switchyard[17] and solar power plant, Western Area Power Administration's ("WAPA")[18] communications equipment, and the Cosumnes Gas-fired Power Plant would still be located at Rancho Seco. Gov't Post Tr. Resp. at 14 (citing TR at 140, 144, 171 (Ronningen)).

---

has worked in the nuclear industry for over forty years. TR at 232. He began his nuclear career with the United States Navy, as an employee of the Division of Labor Reactors. TR at 233. After ten years, he moved to a consulting company named Picard, Lowe and Garrick. TR at 234. Mr. Brewer left Picard, Lowe and Garrick to begin ABZ, Incorporated. TR at 234. In his work as a nuclear engineering consultant, the United States Court of Federal Claims has qualified Mr. Brewer as an expert in nuclear engineering and nuclear decommissioning. TR at 239. During trial, the Government proffered Mr. Brewer as an expert in nuclear engineering—that includes SNF management, nuclear power plant systems, NRC regulations, and nuclear power plant modifications—as well as nuclear decommissioning. TR at 241. SMUD did not object to Mr. Brewer's qualifications. TR at 241. Accordingly, the court has determined that Mr. Brewer is an expert in his respective field and qualified to testify as such. *See* Fed. R. Evid. 702.

[17] The switchyard is the "infrastructure that was installed to take the electricity that Rancho Seco generated and put it on the distribution grid." TR at 119 (Ronningen).

[18] WAPA is an agency within the United States Department of Energy that transmits and sells hydropower across fifteen central and western states. *See* WESTERN AREA POWER

### c.     SMUD's Reply.

SMUD replies that the evidence presented at trial established that, in the non-breach world, SMUD would not have incurred maintenance and operation costs for the T&R building and PAP building from 2010 to 2015.  Pl. Post Tr. Reply at 3.  Mr. Ronningen testified that Rancho Seco is no longer a functioning power plant, so the only employees located there are nuclear staff.  Pl. Post Tr. Reply at 5 (citing TR at 69 (Ronningen)).  The nuclear staff is at Rancho Seco solely to oversee the safe storage of SNF.  Pl. Post Tr. Reply at 3 (citing TR at 65 (Ronningen)).  Moreover, it is undisputed that these employees are necessary to "manage, operate, and guard the SNF, as well as ensure compliance with NRC regulations, including [maintenance of] a nuclear record vault [onsite]."  Pl. Post Tr. Reply at 5 (citing TR at 243–45 (Brewer)).  The T&R building and PAP building house the offices of Rancho Seco's nuclear staff and are not used by any other SMUD employee.  Pl. Post Tr. Reply at 5 (citing TR at 69 (Ronningen)).  This evidence demonstrates that, in the non-breach world, SMUD would not have incurred costs to maintain the T&R building and PAP building.

### d.     The Court's Resolution.

Causation is an issue of fact that plaintiff must prove by a preponderance of the evidence.  *See Energy Capital*, 302 F.3d at 1332 ("In contract cases, causation, foreseeability, and certainty are questions of fact."); *id*. at 1325 (instructing that plaintiff must prove causation by a preponderance of the evidence to recover expectancy damages in a breach of contract claim).  In cases arising out of DOE's partial breach of the Standard Contract, causation requires the court to compare the breach world with a hypothetical non-breach world.  *See Yankee Atomic*, 536 F.3d at 1273.  Plaintiff is entitled to recover only those costs that (1) were caused by DOE's breach, *Energy Capital*, 302 F.3d at 1325, and (2) Plaintiff would not have incurred in the non-breach world, *Energy Nw.*, 641 F.3d at 1307.

The Government argues that SMUD is not entitled to recover costs incurred to maintain the T&R and PAP buildings, because those costs benefit SMUD's non-nuclear business objectives and provide only incidental benefits to the storage of SNF.  Gov't Post Tr. Resp. at 9–10.  In other words, SMUD has failed to establish that its claimed costs are attributable to the continued presence of SNF at Rancho Seco.  The weight of the evidence, however, cuts against the Government's argument.  At trial, Mr. Ronningen testified that in 2010 the T&R building contained offices for nuclear staff and security officers, responsible for guarding Rancho Seco's SNF.  TR at 65 (Ronningen).  No one else occupied the building.  TR at 65 (Ronningen).  After 2010, the nuclear staff and security officers were transferred to the PAP building.  TR at 67–68 (Ronningen).  The PAP building housed only these employees.  TR at 81 (Ronningen).  At the time of the move, SMUD stopped maintaining the T&R building and, in 2015, demolished it.  TR at 81, 86 (Ronningen).

---

ADMINISTRATION HISTORY, https://www.wapa.gov/About/history/Pages/History.aspx (last visited Feb. 23, 2017).

The Government did not produce affirmative evidence to rebut Mr. Ronningen's testimony. But, during cross-examination, Mr. Ronningen admitted that the PAP building served as a checkpoint for the entire Rancho Seco complex and that non-nuclear personnel sometimes passed through there. TR at 167 (Ronningen). The witness, however, clarified that the PAP building likely remained a checkpoint, because the nuclear staff and security officers were located there. TR at 167 (Ronningen). In the non-breach world, the PAP building would have been unoccupied. TR at 81 (Ronningen). Moreover, the Government's own witness admitted that costs for maintaining and operating offices for Rancho Seco's nuclear staff and security force are attributable to DOE's partial breach of the Standard Contract. TR at 246–47 (Brewer). Therefore, the court has determined that SMUD established that the costs incurred to maintain and operate the T&R and PAP buildings are attributable to the continued presence of SNF at Rancho Seco.

In addition, SMUD has established that it would not have incurred costs to maintain and operate the T&R and PAP buildings in the non-breach world. Mr. Ronningen testified that the T&R building was occupied only by nuclear staff. TR at 65 (Ronningen). And, that virtually all of the costs associated with maintaining and operating the T&R building seized after those employees moved out. TR at 86 (Ronningen). In fact, SMUD demolished the T&R building a short time after the nuclear staff was transferred to the PAP building. TR at 81 (Ronningen). The Government did not rebut this testimony. Instead, Mr. Brewer admitted that the presence of SNF at Rancho Seco made it necessary to have nuclear staff and security personnel onsite. TR at 243 (Brewer). And, that these employees need offices with functioning lights, heating and ventilation, running water, bathrooms, computers and internets access, and fire safety equipment. TR at 244–45 (Brewer). In other words, the nuclear staff requires an operational office building and that office building must be maintained. Based on the testimony of Mr. Ronningen and Mr. Brewer, the court has determined that, in the non-breach world, SMUD would not have incurred costs to maintain and operate the T&R building after 2004, when all of Rancho Seco's SNF would have been removed.

Mr. Ronningen also testified that the PAP building would have been unoccupied in the non-breach world. TR at 81 (Ronningen). In addition, the PAP building does not provide any support to SMUD's Backup Control Center ("BCC"), [19] switchyard or solar power plant. TR at 119, 121 (Ronningen). The Government produced evidence that the PAP building serves as a security checkpoint for the entire Rancho Seco facility. TR at 167 (Ronningen). But, as mentioned above, Mr. Ronningen explained that the PAP building only served as a de facto checkpoint, because the nuclear staff and security personnel are already located there. TR at 167 (Ronningen). Therefore, the court has determined that in the non-breach world, SMUD would not have incurred costs to maintain and operate the PAP building.

---

[19] "SMUD maintains a backup control center at [Rancho Seco], which ensures that in the event of an emergency at SMUD's headquarters in downtown Sacramento . . . the utility will still be able to operate its grid and provide power to its customers." TR at 27–28 (Ronningen).

For these reasons, the court has determined that SMUD is entitled to recover $3,685,112 for costs incurred to maintain and operate the T&R and PAP buildings from January 1, 2010 to June 30, 2015.

### 2. Whether SMUD Is Entitled To Recover Costs Incurred For Site Consolidation, Upgrades To The PAP Building's Water And Septic Systems, And Planning To Replace The ISFSI Backup Generator.

#### a. SMUD's Argument.

SMUD argues that it is entitled to recover $698,255 for site consolidation costs, because those costs are attributable to DOE's partial breach of the June 14, 1983 Standard Contract and are reasonable. Pl. Post Tr. Br. at 13. Specifically, SMUD claims $567,505 for costs incurred moving Rancho Seco's nuclear staff from the T&R building to the PAP building and $126,114 for work done to the PAP building's water and septic systems after the move. Pl. Post Tr. Br. at 13–14. SMUD also claims $4,637 for planning that was necessary to replace the ISFSI backup generator, required by NRC regulations. Pl. Post Tr. Br. at 13–14.

SMUD's site consolidation effort, and water and septic upgrades are attributable to the presence of SNF at Rancho Seco. Pl. Post Tr. Br. at 18. And, these efforts reduced SMUD's operation costs from 2010 to 2015. Pl. Post Tr. Br. at 18. In addition, SMUD should recover the cost of planning to replace the ISFSI backup generator, because SMUD was required to have a backup generator for the ISFSI. Pl. Post Tr. Br. at 14 (citing DX 73 at ¶ 27 (Brewer)).

#### b. The Government's Response.

The Government challenges the $698,255 claimed by SMUD for site consolidation, upgrades to the PAP building's water and septic systems, and planning to replace the ISFSI backup generator, as they were incurred to improve infrastructure that provides support to Rancho Seco's non-nuclear business. Gov't Post Tr. Resp. at 9–10. In addition, SMUD did not "prove the extent to which [its] incurred costs differ from the costs [it] would have incurred in the non-breach world." Gov't Post Tr. Br. at 11 (citing *Energy Nw.*, 641 F.3d at 1306).

#### c. SMUD's Reply.

SMUD replies that the purpose of the site consolidation project was to "to move the staff overseeing the nuclear fuel from the large, aging T&R building to the smaller PAP building in order to save operations and maintenance expenses." Pl. Post Tr. Reply at 8 (citing TR at 68, 78–81 (Ronningen); PX 20 (Site Consolidation Presentation)). SMUD upgraded the PAP building's water and septic systems to reduce operating expenses. Pl. Post Tr. Reply at 8 (citing TR at 73–74 (Ronningen); *see also* PX 20.013–20.014). If DOE had removed the SNF from Rancho Seco by 2004, SMUD would not have needed to consolidate the T&R and PAP buildings, or upgraded the water and septic systems. Pl. Post Tr. Reply at 9 (citing TR at 81 (Ronningen)).

**d.      The Court's Resolution.**

Mr. Ronningen testified that he prepared SMUD's damages claim and that his objective throughout that process was "[t]o capture the costs associated with the presence of spent nuclear fuel at Rancho Seco." TR at 48 (Ronningen). In determining what costs to include in the claim, Mr. Ronningen "evaluat[ed] [] the work that was done . . . and ma[de] a reasonable assumption and a conservative assumption about how much of [those] costs were directly related to the presence of spent nuclear fuel." TR at 51–52 (Ronningen). The Government argues that this testimony demonstrates that Mr. Ronningen did not consider whether costs related to site consolidation, upgrades to the PAP building's water and septic systems, and planning to replace the ISFSI backup generator would have been incurred in the non-breach world. Gov't Post Tr. Br. at 12.

During the trial, however, SMUD presented credible evidence of the non-breach world, demonstrating that SMUD would not have consolidated the T&R and PAP buildings, upgraded the water and septic system in the PAP building, or replaced the ISFSI's backup generator if DOE had performed on the Standard Contract. Mr. Ronningen testified that SMUD would not have "done the consolidation from the T&R building to the PAP building if the spent fuel was gone by 2004[.]" TR at 81 (Ronningen). He also testified that SMUD would not have needed a septic system or new drinking water system in Rancho Seco if DOE had removed the SNF. TR at 78 (Ronningen). Finally, Mr. Ronningen testified that SMUD would not have purchased the ISFSI backup generator if the SNF was offsite. TR at 100 (Ronningen). Moreover, the generator did not provide ancillary benefits to any other equipment at Rancho Seco, except for some WAPA instruments. TR at 99 (Ronningen). But, in the non-breach world, those instruments would be located in the switchyard and connected to a separate generator. TR at 163, 217 (Ronningen).

The Government's expert witness, Mr. Brewer, testified that "SMUD has not explained how the site modifications or consolidation efforts have been influenced by the presence of personnel remaining on the site for decommissioning or other functions not needed for the continued storage of spent nuclear fuel." DX 72 at ¶ 42 (Brewer). But, this testimony is inaccurate. At trial, SMUD presented evidence that, after consolidation, only nuclear staff and security personnel had offices in the PAP building. TR at 81 (Ronningen). And, the PAP building did not provide support to other Rancho Seco buildings. TR at TR at 119, 121 (Ronningen). In addition, Mr. Ronningen testified that the SMUD employees who worked on the BCC, switchyard and solar power plant were not permanently stationed at Rancho Seco. TR at 119, 121 (Ronningen). Instead, they worked from SMUD headquarters and visited the site a few times per year to check on equipment. TR at 119, 121 (Ronningen). Finally, Mr. Ronningen knew that non-nuclear staff periodically visited Rancho Seco, but he nevertheless testified that the site consolidation project would not have occurred but-for the required presence of nuclear staff and security onsite. TR at 81, 164 (Ronningen). Combined, this evidence demonstrates that the presence of non-nuclear staff at Rancho Seco did not impact the site consolidation project.

Mr. Brewer also testified that SMUD failed to explain why its decision to consolidate the T&R and PAP buildings in 2010 was attributable to the continued presence of SNF at Rancho Seco, given that all of Rancho Seco's SNF had been in dry storage since 2002 and the activities needed to store the SNF had remained static for several years. DX 72 at ¶ 41 (Brewer). But, Mr.

Ronningen testified that Rancho Seco's nuclear staff was greatly reduced when SMUD completed the decommissioning process in 2008. TR at 67 (Ronningen). In fact, by the end of 2010, SMUD's nuclear staff had been reduced from "about a dozen" to three. TR at 65 (Ronningen). It made little sense for three people to occupy an entire building, especially a thirty-year old one with five stories and an aging HVAC. TR at 66–67 (Ronningen). It is undisputed, however, that the continued presence of SNF at Rancho Seco required SMUD to maintain some nuclear staff onsite. TR at 243 (Brewer) ("Q. You agree that it's necessary to have people to manage the spent fuel, right? A. I do. Q. And it's necessary to have security personnel to guard the fuel, correct? A. It is. Q. SMUD needs staff like Mr. Ronningen to work with the NRC to ensure compliance, right? A. They need some level of staff to ensure compliance, that's correct."). It is also undisputed that the nuclear staff needs offices to work in. TR at 244 (Brewer) ("So, you do agree that SMUD needs a building for the security staff to work in, Mr. Brewer, right? A. Just -- I do, just as any other people that are on the site need somewhere to do their work."). This testimony demonstrates that SMUD's decision to consolidate the T&R and PAP building in 2010 was attributable to the continued presence of SNF at Rancho Seco.

For these reasons, the court has determined that SMUD is entitled to $698,255 for cost incurred for Site Consolidation, upgrades to the PAP building's water and septic systems, and planning to replace the ISFSI backup generator.

### 3.   Whether SMUD Is Entitled To Recover Costs Incurred To Replace The HVAC Unit And Install New Carpet In The PAP Building.

#### a.   SMUD's Argument.

SMUD argues that it is entitled to recover $452,899, incurred to replace the PAP building's failing HVAC unit. Pl. Post Tr. Br. at 19. The PAP building houses nuclear personnel and a nuclear records vault, that must be maintained onsite due to the continued presence of SNF at Rancho Seco. Pl. Post Tr. Br. at 20. The vault and personnel housed in the PAP building require adequate heating, ventilation and air conditioning. Pl. Post Tr. Br. at 19–20. The PAP building's original HVAC unit was installed in the 1980s. Pl. Post Tr. Br. at 19 (citing TR at 104 (Ronningen)). In 2015, when SMUD decided to replace it, the old equipment was antiquated and failing. Pl. Post Tr. Br. at 19 (citing TR at 104–05 (Ronningen)).

SMUD also argues that it is entitled to recover $28,308 because "[i]t was eminently reasonable for SMUD to install carpet in the PAP building to prepare the PAP to serve as the staff office building." Pl. Post Tr. Br. at 20 (citing TR at 82–83 (Ronningen)).

#### b.   The Government's Response.

The Government challenges SMUD's claimed costs for installation of the PAP building's new HVAC unit and carpets, because these costs were incurred to improve infrastructure that provides support to non-SNF workers. Gov't Post Tr. Resp. at 9–10. In addition, the Government argues that SMUD did not "prove the extent to which [its] incurred costs differ from the costs [it] would have incurred in the non-breach world." Gov't Post Tr. Br. at 11 (citing *Energy Nw.*, 641 F.3d at 1306)).

### c.      SMUD's Reply.

SMUD replies that "[t]he Government presents no facts or evidence to dispute the causal connection between [DOE's] breach [of the Standard Contract] and the HVAC [and] carpet costs." Pl. Post Tr. Reply at 10.  Mr. Ronningen testified that SMUD would not have moved the SNF staff to the PAP building, if DOE removed Rancho Seco's SNF by 2004.  Pl. Post Tr. Reply at 10 (citing TR at 81 (Ronningen)).  And, if the PAP building would not have been occupied in the non-breach world, then SMUD would not have needed to replace the HVAC unit and carpets in that building. Pl. Post Tr. Reply at 10.  Therefore, the costs that SMUD incurred to replace the HVAC unit and carpets are due to DOE's breach of the Standard Contract and the Government's witnesses did not offer any evidence to rebut this conclusion.  Pl. Post Tr. Reply at 10.

### d.      The Court's Resolution.

Mr. Ronningen testified that the PAP building did not provide support to other Rancho Seco buildings.  TR at 119, 121 (Ronningen).  And, the nuclear staff and security were the only employees located in the PAP building.  TR at 81 (Ronningen).  The Government did not present any evidence to the contrary.  Therefore, SMUD established that the PAP building's new HVAC unit and carpets do not benefit Rancho Seco's non-nuclear activities.

Mr. Ronningen also testified that, in the non-breach world, the PAP building would not have been occupied.  TR at 81 (Ronningen).  Therefore, SMUD would not have installed new carpets in the building.  And, the failing HVAC system would not have been replaced.  TR at 106 (Ronningen).  The Government did not offer any specific evidence to rebut this testimony. Accordingly, SMUD has established that, in the non-breach world, it would not have incurred costs to replace the PAP building's HVAC unit and carpets.

For these reasons, the court has determined that SMUD is entitled to recover $481,207 for costs incurred to replace the HVAC unit and install new carpets in the PAP building.

### 4.      Whether SMUD Is Entitled To Recover Costs Incurred To Replace The ISFSI Backup Generator And Refurbish Parts Of Rancho Seco's Electrical Infrastructure.

### a.      SMUD's Argument.

SMUD argues that it is entitled to recover $573,214 for costs incurred to replace the diesel generator that provides backup power to the ISFSI and associated modification to the aging electrical infrastructure that supports the ISFSI and the PAP building.  Pl. Post Tr. Br. at 21.  NRC regulations require SMUD to maintain a functioning backup generator for the ISFSI and the ISFSI's original backup generator reached the end of its useful life during the claim period.  Pl. Post Tr. Br. at 21 (citing TR at 95–96, 99 (Ronningen)).  Therefore, SMUD was required to purchase and install a new backup generator and associated switchgear to comply with NRC regulations.  Pl. Post Tr. Br. at 21 (citing TR at 95–96, 99 (Ronningen)).

Replacing the backup generator and switchgear involved "substantial work to design and implement the integration of the new equipment into the existing electrical distribution system, install the new equipment, connect it to the distribution infrastructure, purchase project-related cabling and fencing, and establish a concrete pad on which to place the generator." Pl. Post Tr. Br. at 21. Additionally, as part of the replacement process, SMUD updated the aging electrical infrastructure that supplies power to the ISFSI and PAP building. Pl. Post Tr. Br. at 21. But, SMUD would not have replaced the backup generator or performed any of the related electrical work, if DOE had removed all SMUD's SNF by 2004. Pl. Post Tr. Br. at 21–22.

The Government does not dispute that SMUD is entitled to recover the purchase price of the backup generator and switchgear, but argues that the cost of installing that equipment should be excluded from SMUD's claim. Pl. Post Tr. Br. at 22. But, Mr. Brewer, their own expert, testified "that the costs of installing the generator and switchgear are attributable to the SNF remaining onsite." Pl. Post Tr. Br. at 22 (citing TR at 257 (Brewer)). The "installation costs" include: "mounting the generator, connecting it to the fuel source, labor costs, and securing the generator with a fence." Pl. Post Tr. Br. at 22 (citing TR at 257 (Brewer)).

Mr. Ronningen's testimony also demonstrates that SMUD replaced the ISFSI backup generator and performed improvements to the electrical infrastructure for the sole purpose of providing backup power to Rancho Seco's nuclear function. Pl. Post Tr. Br. at 24. The Government argues that this claim includes "costs associated with site restoration," such as "the re-feed of lighting power to the Turbine building, Chlorine building, and Warehouse/shops building," is mistaken. Pl. Post Tr. Br. at 22–23 (citing DX 73 at ¶ 52 (Brewer)). SMUD, however, only worked on the electrical equipment in the turbine and chlorine buildings, because the existing electrical distribution system passed through those facilities and it was less costly to refurbish the old equipment than to create a brand new system that avoided the two buildings entirely. Pl. Post Tr. Br. at 23. Although the warehouse building "*may* have lights that are powered through the nuclear electrical distribution system," it would not be in use if Rancho Seco's SNF had been removed by 2004. Pl. Post Tr. Br. at 24 n.11. Finally, the backup generator and improvements to the electrical distribution systems do not support the BCC or switchyard building. Pl. Post Tr. Br. at 23 (citing TR at 97, 154, 162–63 (Ronningen)).

### b.    The Government's Response.

The Government challenges $449,717 of SMUD's claim for costs incurred replacing the backup generator and refurbishing parts of Rancho Seco's electrical infrastructure, because they were incurred to improve infrastructure that provides support to non-nuclear activities at Rancho Seco. Gov't Post Tr. Resp. at 9–10. In addition, SMUD did not "prove the extent to which [its] incurred costs differ from the costs [it] would have incurred in the non-breach world." Gov't Post Tr. Br. at 11 (citing *Energy Nw.*, 641 F.3d at 1306)).

### c.    SMUD's Reply.

SMUD replies that, in the non-breach world, it would not have purchased a new backup generator for the ISFSI. Pl. Post Tr. Reply at 11 (citing TR at 100 (Ronningen)). As Mr. Brewer conceded, the cost to purchase and install the generator is attributable to SNF remaining at Rancho

Seco.  Pl. Post Tr. Reply at 11 (citing TR at 256–57 (Brewer)).  Similarly, "[t]he only reason why the electrical distribution system continues to exist at Rancho Seco is to support the nuclear infrastructure."  Pl. Post Tr. Reply at 11 (citing TR at 162 (Ronningen)).  Therefore, SMUD's improvements to the electrical system only benefitted Rancho Seco's SNF-related operations.  Pl. Post Tr. Reply at 11 (citing TR at 97–99, 163 (Ronningen)).

### d.      The Court's Resolution.

Mr. Ronningen testified that the backup generator does not provide any ancillary benefit to non-nuclear equipment, except certain WAPA instruments.  TR at 99 (Ronningen).  But, in the non-breach world, those instruments would be located at the switchyard, which has a separate backup generator.  TR at 163, 217 (Ronningen).  Moreover, SMUD's upgrades to the electrical system do not benefit Rancho Seco's non-nuclear functions.  TR at 97, 98, 154, 162–63 (Ronningen).  As rebuttal evidence, the Government produced Mr. Brewer's testimony that SMUD should not recover some of the costs incurred to upgrade the electrical system, because those upgrades help support power distribution to buildings that have a non-nuclear function.  DX 73 at ¶ 52 (Brewer).  Specifically, Mr. Brewer identified "the Turbine building, Chlorine building, and Warehouse/shops building."  DX 73 at ¶ 52 (Brewer).  Mr. Ronningen, however, explained that the Turbine and Chlorine buildings were not operational during the claim period.  TR at 98 (Ronningen) ("Q. Were the turbine building and chlorine building -- was that being used in any way during the claim period?  A. No, there's no functions that occur in there[.]").  Regarding the warehouse, Mr. Ronningen testified that there *may* be some lighting in that building.  TR at 154 (Ronningen) (emphasis added).  But, most of the material stored there is SNF handling equipment.  TR at 221 (Ronningen).  Therefore, SMUD has established that installation of the backup generator and associated upgrades to portions the electrical infrastructure, were not performed for the benefit of Rancho Seco's non-nuclear functions.

Moreover, Mr. Ronningen testified that SMUD would not have purchased the backup generator or done any of the associated electrical work, if DOE had removed Rancho Seco's SNF by 2004.  TR at 100 (Ronningen).  The Government does not dispute this testimony.  In fact, on cross-examination, Mr. Brewer admitted that the cost of purchasing a new backup generator and switchgear, and installing that equipment were attributable to the presence of SNF at Rancho Seco.  TR at 256–57.  Therefore, SMUD has established that, in the non-breach world, it would not: have purchased the ISFSI backup generator or switchgear; installed that equipment; or upgraded the relevant portions of Rancho Seco's electrical distribution infrastructure.

For these reasons, the court has determined that SMUD is entitled to recover $573,214 for costs incurred to replace the ISFSI backup generator and renovate parts of the electrical distribution system that supports the ISFSI and the PAP building.

5.      **Whether SMUD Is Entitled To Recover Costs Incurred For Operating, Maintaining And Repairing The IOSB And For Refurbishing Fuel Handling Equipment Stored In The IOSB.**

a.      **SMUD's Argument.**

SMUD argues that it incurred $980,500 in costs for operating, maintaining and repairing the IOSB, and refurbishing the spent fuel handling equipment stored there.  Pl. Post Tr. Br. at 9 (citing PX 50; TR at 57–60 (Ronningen)).  The court awarded SMUD similar costs in Civil Action Docket No. 09-587C, and should do so again in this case.  Pl. Post Tr. Br. at 9.

In 2002, SMUD used fuel handling equipment to transfer Rancho Seco's SNF from the wet-pool to the newly constructed ISFSI.  Pl. Post Tr. Br. at 9.  As a result, this equipment became radioactively contaminated and it had to be stored in a licensed facility, such as the IOSB.  Pl. Post Tr. Br. at 9.  During construction of a permanent storage building that was not completed before June 30, 2015, the IOSB housed the fuel handling equipment.  Pl. Post Tr. Br. at 9.

At trial, Mr. Ronningen testified that SMUD would not have used the ISOB to store fuel handling equipment, if DOE had removed the SNF by 2004.  Pl. Post Tr. Br. at 10 (citing TR at 60 (Ronningen)).  And, Mr. Brewer agreed that the presence of fuel handling equipment at Rancho Seco and the work necessary to maintain that equipment, were attributable to the presence of SNF.  Pl. Post Tr. Br. at 10 (citing TR at 254 (Brewer)).

In sum, as long as SNF is stored at Rancho Seco, it will be necessary for SMUD to store the fuel handling equipment onsite, because an emergency may require the removal of an SNF canister.  Pl. Post Tr. Br. at 9 (citing *SMUD VIII*, 109 Fed. Cl. at 691).  Additionally, SMUD is preparing to renew its ISFSI license, pursuant to 10 C.F.R. 72.[20]  And, as part of the relicensing process, the NRC may require SMUD to extract SNF canisters from the ISFSI.  Pl. Post Tr. Br. at 10.

b.      **The Government's Response.**

The Government responds that SMUD recovered IOSB costs in Civil Action Docket No. 09-587C, based on specific circumstances that do not apply in this case.  Gov't Post Tr. Resp. at 18.  In Docker No. 09-587C, SMUD argued that it refurbished the IOSB to store Class B and C

---

[20] 10 C.F.R. 72, in relevant part, provides,

 requirements, procedures, and criteria for the issuance of licenses to receive, transfer, and possess power reactor spent fuel, power reactor-related Greater than Class C (GTCC) waste, and other radioactive materials associated with spent fuel storage in an independent spent fuel storage installation (ISFSI) and the terms and conditions under which the Commission will issue these licenses.

10 C.F.R. 72.1.

waste.[21]  Gov't Post Tr. Resp. at 18 (citing *SMUD VIII*, 109 Fed. Cl. at 690).  The court, however, determined that all Rancho Seco's nuclear waste, including Class B and C waste, would have been removed by 2009, if DOE had performed on the Standard Contract.  Gov't Post Tr. Resp. at 18 (citing *SMUD VIII*, 109 Fed. Cl. at 691).  Therefore, "in the non-breach world, SMUD would not have refurbished the IOSB nor incurred operation and maintenance costs for the IOSB."  Gov't Post Tr. Resp. at 18 (citing *SMUD VIII*, 109 Fed. Cl. at 691).  In addition, the court determined that, in the non-breach world, SMUD would not be required to maintain transfer equipment at Rancho Seco, because SMUD's SNF and HLW would have been removed by 2004.  Gov't Post Tr. Resp. at 18 (citing *SMUD VIII*, 109 Fed. Cl. at 691).

In this case, however, Mr. Ronningen testified that SMUD removed all Class B and C waste from Rancho Seco in 2014.  Gov't Post Tr. Resp. at 19–20 (citing TR at 185 (Ronningen)).  In addition, Mr. Ronningen also testified that SMUD intended to decommission and dismantle the IOSB despite the continued presence of SNF at Rancho Seco.  Gov't Post Tr. Resp. at 20 (citing TR at 186 (Ronningen)).  Moreover, during the current claim period, some of the SNF handling equipment, including the transfer cask and the hydraulic ram, was not stored in the IOSB.  Gov't Post Tr. Resp. at 20 (citing TR at 190 (Ronningen)).  Mr. Ronningen testified that SMUD installed a new building on the ISFSI to store some of the handling equipment.  Gov't Post Tr. Resp. at 20 (citing TR at 189 (Ronningen)).  For these reasons, SMUD has failed to demonstrate that the planning, operation, and maintenance of the IOSB were necessitated by the presence of SNF at Rancho Seco or that the same circumstances justifying recovery of IOSB costs in Docket No. 09-587C exist in this case.  Gov't Post Tr. Resp. at 20.

### c.    SMUD's Reply.

SMUD replies that the removal of Rancho Seco's Class B and C waste is irrelevant to whether SMUD can recover ISOB costs.  Pl. Post Tr. Reply at 12.  In *SMUD VIII*, the court awarded IOSB costs, because it determined that the building was necessary to store contaminated handling equipment that would not be onsite, if DOE performed the Standard Contract.  Pl. Post Tr. Reply at 12 (citing *SMUD VIII*, 109 Fed. Cl. at 684, 691).  The court's determination was not based on the presence of Class B and C waste at Rancho Seco.  P. Post Tr. Reply at 12.

In addition, the Government's argument that SMUD stored uncontaminated handling equipment outside of the IOSB is irrelevant, because the IOSB is necessary to store contaminated handling equipment, and Mr. Ronningen testified that all of SMUD's contaminated equipment was stored there until 2015.  Pl. Post Tr. Reply at 13 (citing TR at 210–11 (Ronningen)).

SMUD adds that its decision to move handling equipment from the IOSB to a new ISFSI building in 2015, is not relevant to SMUD's claim for IOSB costs incurred before the move.  Pl.

---

[21] The NRC categorized low-level waste as Class A, B or C, according to the radiological hazard of the waste.  *See* 10 C.F.R. 61.55(a)(1).  Class A is the least hazardous, and Class C is the most.  *See* 10 C.F.R. 61.55(a)(2).  As the Class increases, NRC regulations impose greater controls to protect the health and safety of the public and the environment.  *Id.*

Post Tr. Reply at 13.  The installation of a new ISFSI building does not establish that SMUD's prior use of the IOSB was inappropriate or unnecessary. Pl. Post Tr. Reply at 13.

### d.      The Court's Resolution.

The Government argues that DOE's partial breach of the Standard Contract did not require SMUD to maintain the IOSB, because Rancho Seco's Class B and C waste was removed by 2014, some of the handling equipment was not stored in the IOSB during the entire claim period, and SMUD transferred the handling equipment to a permanent building within the ISFSI in 2015. Gov't Post Tr. Br. at 19–20.  It is unclear whether the Government is arguing that: (1) SMUD's continued use of the IOSB was not caused by the DOE's partial breach; or (2) it was unreasonable for SMUD to continue using the IOSB under the circumstances.  Either way, the Government's argument is not persuasive.

Regarding causation, the DOE's partial breach of the Standard Contract was a substantial factor in, if not the but-for cause of, SMUD's use of the IOSB from 2010 to 2015.  During that time period, the IOSB was used to store Class B and C waste, and contaminated fuel handling equipment. TR at 57, 185.  Mr. Ronningen, however, testified that SMUD would not have used the IOSB from 2010 to 2015 if DOE had performed under the Standard Contract.  TR at 60 (Ronningen).  The Government did not refute this testimony.  In fact, Mr. Brewer agreed that SMUD would not have used the IOSB to store handling equipment, "because there would have been none." TR at 254 (Brewer).  And, refused to provide any opinion on whether the IOSB would have been used to store Class B and C waste.  TR at 254 (Brewer) ("Q. [Y]ou are not offering an opinion in this case that the B and C waste would have been onsite [after] 2009, is that correct? A. No, I'm not.").  In light of the Government's failure to refute Mr. Ronningen's testimony, the court has found that SMUD would not have operated the IOSB during the claim period if DOE removed Rancho Seco's SNF by 2004.  In other words, DOE's breach is the but-for cause of SMUD's continued use of the IOSB.

Regarding reasonableness, a party that is mitigating damages from a breach is only required to "make those efforts that are fair and reasonable under the circumstances."  *Home Savings of Am. v. United States*, 399 F.3d 1341, 1353 (Fed.Cir.2005) (quoting *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed.Cir.2002)).  The breaching party bears the burden of establishing that a certain mitigation effort was unreasonable.  *See SMUD V*, 293 F. App'x at 772 ("It is the Government's burden to show that it was unreasonable for SMUD to pursue [certain efforts] to mitigate the Government's breach); *see also Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006) ("[T]he government bears the burden of showing that [plaintiff's] mitigation efforts were unreasonable.").

In this case, the Government has not satisfied its burden of establishing that it was unreasonable for SMUD to store Class B and C waste, and fuel handling equipment in the IOSB. The Government's argument that it was not reasonable for SMUD to use the IOSB after it removed the Class B and C waste from that building in 2014, is irrelevant for most of the claim period, covering January 1, 2010 to June 30, 2015.  Moreover, SMUD was required to store contaminated handling equipment in a licensed facility, such as the IOSB.  TR at 59–60, 211 (Ronningen).  And, the equipment had to remain onsite, because an emergency might require the removal of an SNF

canister from the ISFSI.  *See SMUD VIII*, 109 Fed. Cl. at 691.  Moreover, SMUD must relicense the ISFSI in the near future and, as part of that process, the handling equipment will be required onsite to move SNF canisters.  TR at 93 (Ronningen).  Therefore, SMUD had the choice between constructing a permanent facility to store the contaminated equipment at Rancho Seco and storing it in the preexisting IOSB.  SMUD decided to store the equipment in the IOSB from 2010 to 2015.  TR at 189.  The Government does not explain how the reasonableness of this decision depends on the presence of Class B and C waste in the IOSB.

In addition, SMUD's decision to store uncontaminated equipment outside of the IOSB is irrelevant.  Mr. Ronningen testified that the IOSB was necessary to house contaminated handling equipment, such as the failed fuel grapple and the lifting yoke.  TR at 211 (Ronningen).  And, all contaminated equipment was stored inside the IOSB during the claim period, except temporarily when SMUD moved the equipment out of the way, so it could dispose of the Class B and C waste that was also stored there.  TR at 58–59 (Ronningen).  Finally, the Government does not explain why SMUD's transfer of the handling equipment to a new ISFSI building after the claim period is relevant to the reasonableness of SMUD's use of the IOSB during that period.

For these reasons, the court has determined that SMUD is entitled to recover $980,500 for costs incurred to operate, maintain and repair the IOSB, and refurbish the spent fuel handling equipment stored in the IOSB.

### 6.   Whether SMUD Is Entitled To Recover Brokerage Fees Incurred To Obtain ANI Insurance.

#### a.   SMUD's Argument.

SMUD incurred insurance brokerage fees of $86,010 to obtain the nuclear insurance required by NRC regulations.  Pl. Post Tr. Br. at 24.  These fees are the direct consequence of DOE's partial breach of the June 14, 1983 Standard Contract and are just as recoverable as the cost of insurance, that the court awarded in *SMUD VIII* and *SMUD X*.  Pl. Post Tr. Br. at 24.

SMUD argues that it established entitlement to claimed brokerage fees with reasonable certainty.  Pl. Post Tr. Br. at 25.  At trial, SMUD presented the testimony of its insurance broker, *i.e.*, "the person with the most credible knowledge about the brokerage fees."  Pl. Post Tr. Br. at 25.  In addition, SMUD produced "numerous documents supporting its brokerage fees" and the "testimony of [Mr. Kenneth P. Metcalfe][22] evaluating and affirming the claimed costs."  Pl. Post Tr. Br. at 25.

---

[22] Mr. Kenneth P. Metcalfe is the Co-Chief Executive Officer of the Kenrich Group in Washington D.C.  TR at 329.  The Kenrich Group provides business consulting services, as well as the analysis and preparation of damages claims.  TR at 330.  Mr. Metcalfe's expertise falls into three main categories: (1) regulated industries and regulatory accounting; (2) government contracts; and (3) economic damages in breach of contract disputes.  TR at 330.  Over his thirty-four year career, Mr. Metcalfe has served as an expert witnesses in over two dozen nuclear fuel cases.  TR at 333.  In 1982, he graduated *cum laude* from Georgetown University School of

Mr. Derek Whipple is a Managing Director at Aon Risk Insurance Services West, Inc. ("Aon"). Pl. Post Tr. Br. at 25. He is "responsible for the brokerage services Aon provides SMUD on all its policies, including its nuclear insurance." Pl. Post Tr. Br. at 25 (citing PX 8 at 42 (Deposition Testimony of Mr. Derek Whipple)). Mr. Whipple testified that, during the claim period, Aon charged SMUD a flat annual brokerage fee for its services. Pl. Post Tr. Br. at 25 (citing PX 8 at 65 (Whipple Deposition)). Aon determined SMUD's annual fees in two contracts. The first established SMUD's fees from 2009 to 2014, and the second established fees from 2014 to 2018. Pl. Post Tr. Br. at 25 (citing PX 8 at 38, 65–66 (Whipple Deposition)). Mr. Whipple testified that "[i]f SMUD no longer needed to purchase nuclear liability insurance, Aon would decrease its annual brokerage fees to SMUD." Pl. Post Tr. Br. at 26 (citing PX 8 at 72–74 (Whipple Deposition)). A conservative estimate of this decrease could be calculated by reducing SMUD's current fees by the percentage of SMUD's ANI premiums to total insurance premiums. Pl. Post Tr. Br. at 26 (citing PX 8 at 76, 81–84 (Whipple Deposition)).

In support of its claimed brokerage fees, calculated using Mr. Whipple's conservative methodology, SMUD produced both Aon contracts with supporting documents showing SMUD's ANI premiums and total premiums and information about the insurance programs that Aon brokered for SMUD. Pl. Post Tr. Br. at 27 (citing PX 1; PX 2; PX 3; PX 4; PX 5; PX 6; PX 12; PX 13; PX 14; PX 15; PX 16; PX 17; PX 18; PX 19; PX 44; PX 45; PX 46). In addition, Mr. Whipple's testimony and the supporting documents produced by SMUD, establish SMUD's claimed brokerage fees with reasonable certainty. Pl. Post Tr. Br. at 28.

### b.      The Government's Response.

The Government responds that SMUD did not prove the claimed brokerage fees with reasonable certainty, because SMUD relied on a flawed estimate prepared by Mr. Whipple and Mr. Metcalfe. Gov't Post Tr. Resp. at 24. Mr. Whipple's testimony is not reliable, because "he lacks personal knowledge about the calculation of fees, and he did not [] consider all of the factors that influence the price of brokerage services." Gov't Post Tr. Resp. at 24. Similarly, Mr. Metcalfe's testimony is unreliable, because he relied on Mr. Whipple's flawed methodology. Gov't Post Tr. Resp. at 24.

Mr. Whipple has no factual basis for assuming that Aon would decrease SMUD's annual brokerage fees, if SMUD no longer needed to purchase nuclear liability insurance. Gov't Post Tr. Resp. at 25. SMUD's brokerage fees for the relevant claim period are established by a contract executed in 2009 and another contract executed in 2014. Gov't Post Tr. Resp. at 25. Mr. Whipple, however, began working for Aon in 2015. Gov't Post Tr. Resp. at 25. Moreover, "[d]espite the multitude of parameters Aon used to determine [SMUD's] brokerage fees, Mr. Whipple only used

---

Business with a major in accounting. TR at 331. In addition, Mr. Metcalfe is a Certified Public Accountant in Virginia, a Certified Valuation Analyst and an Associate Certified Fraud Examiner. TR at 331. SMUD proffered Mr. Metcalfe as an expert in cost and regulatory accounting in the utility industry. TR at 337. The Government did not object to Mr. Metcalfe's qualifications. Accordingly, the court has determined that Mr. Metcalfe is an expert in his respective field and qualified to testify as such. *See* Fed. R. Evid. 702.

one[,] level of premiums[,] when he estimated the portion of brokerage fees attributable to the ANI nuclear liability insurance."  Gov't Post Tr. Resp. at 26.

### c.      SMUD's Reply.

SMUD replies that "[t]he Government misunderstands SMUD's burden and confuses the breach and non-breach worlds."  Pl. Post Tr. Reply at 14.  "[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party.  If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."  Pl. Post Tr. Reply at 14 (quoting *LaSalle Talman Bank*, 317 F.3d at 1374).

In the non-breach world, SMUD would have exited the nuclear industry by 2009.  Pl. Post Tr. Reply at 14 (citing *SMUD VIII*, 109 Fed. Cl. at 694).  Accordingly, SMUD would not have purchased the nuclear insurance policies brokered by Aon.  Pl. Post Tr. Reply at 14.  Therefore, SMUD is entitled to recover the costs of the brokerage fees.  Pl. Post Tr. Reply at 14.  Any imprecision in the calculation of these fees falls on the Government, as the breaching party.  Pl. Post Tr. Reply at 14.

The fact that Mr. Whipple, who serves as SMUD's insurance broker, was not an Aon employee at the time that SMUD and Aon signed the brokerage fee contracts is not material to whether he has knowledge of the brokerage activities or fees incurred.  Pl. Post Tr. Reply at 15. Mr. Whipple is a Senior Executive at Aon with over a decade of experience in the insurance brokerage industry.  Pl. Post Tr. Reply at 15.  His experience and understanding of brokerage fee negotiations, as well as his familiarity with SMUD and its insurance requirements, provide him with sufficient knowledge to credibly testify that SMUD's annual brokerage fees would be lower in the non-breach world.  Pl. Post Tr. Reply at 15.

The fact that, Mr. Whipple did not address all factors relevant to brokerage fee negotiations does not undermine his testimony.  Pl. Post Tr. Reply at 16.  Mr. Whipple admitted that there are multiple ways to estimate SMUD's brokerage fees, but those methods yield higher estimates.  Pl. Post Tr. Reply at 16.  Moreover, Mr. Whipple's methodology is commonly used to calculate brokerage fees.  Pl. Post Tr. Reply at 16.

### d.      The Court's Resolution.

"The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'"  *Bluebonnet*, 266 F.3d at 1355 (quoting *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969)); *see also Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960) ("Certainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages.").

In this case, SMUD produced sufficient evidence for the court to make a fair and reasonable approximation of the brokerage fees it incurred to purchase ANI insurance.  As the Aon director responsible for all of SMUD's brokerage fees, Mr. Whipple was in a position to testify regarding

what portion of SMUD's brokerage fees are attributable to ANI insurance. The fact that Mr. Whipple was not employed by Aon during the negotiation of SMUD's brokerage fees for the relevant time period does not undermine his credibility. It is reasonable to assume that the managing director in charge of SMUD's brokerage fees would familiarize himself with the factors that affect their pricing.

In addition, Mr. Whipple's methodology provides the basis for a "fair and reasonable *approximation*" of SMUD's ANI brokerage fees. *See Bluebonnet*, 266 F.3d at 1355 (emphasis added). Mr. Whipple testified that his methodology provided a conservative estimate of SMUD's brokerage fees, because "[i]f SMUD were to obtain brokerage services on the open market, it could expect to pay a commission equal to a fixed percentage of the premium amounts." PX 9 at ¶ 7 (Whipple Declaration). A typical commission ranges from 10% to 15%. PX 9 at ¶ 7 (Whipple Declaration). But, even assuming a 10% rate, SMUD's ANI brokerage fee would be much higher than Mr. Whipple's estimate. PX 9 at ¶ 7 (Whipple Declaration). The Government does not dispute Mr. Whipple's methodology, except to argue that he did not consider all of the factors that could have affected the pricing of SMUD's brokerage fees. But, "certainty" does not require SMUD to consider all of the relevant factors. Indeed, it is not "essential that the [amount of damages] be ascertainable with absolute exactness or mathematical precision. *See Bluebonnet*, 266 F.3d at 1355. SMUD is only required to provide the basis for a "fair and reasonable *approximation*." *Id*. (emphasis added).

For these reasons, the court has determined that SMUD satisfied this standard. Accordingly, SMUD is entitled to recover $86,010 for brokerage fees incurred to purchase ANI insurance.

### 7. Whether The Government Is Entitled To An Offset For Certain ANI Insurance Refunds That SMUD Received.

#### a. SMUD's Argument.

SMUD also claims ANI insurance premiums from 2010 to 2015, because the Government is not entitled to a $682,397 offset for refunds that SMUD received between 2010 and 2014, for premiums that SMUD paid before 2004. Pl. Post Tr. Br. at 30. An offset based on these insurance refunds would require the court to combine damages from this claim period with damages from an earlier claim period. *See* Civil Action Docket No. 98-488C (claiming breach of contract damages for costs that SMUD incurred from 1992 to 2004). But, the United States Court of Appeals for the Federal Circuit has held that combining damages from two separate claim periods violates "the settled principle that a breaching party should never be placed in a better position as a result of its breach." Pl. Post Tr. Br. at 30 (quoting *SMUD IX*, 566 F. App'x at 996).

#### b. The Government's Response.

The Government responds that SMUD's ANI insurance claim should be offset by the full amount of ANI refunds, received from 2010 to 2015, because these refunds lessen the financial impact of paying premiums for those years. Gov't Post Tr. Resp. at 20. Moreover, the "premiums SMUD pays each year are not . . . segregated for a particular year." Gov't Post Tr. Resp. at 21.

Instead, the premiums go into a general fund that is used to pay claims, expenses and refunds. Gov't Post Tr. Resp. at 21.  Refunds are calculated yearly.  Gov't Post Tr. Resp. at 22.

In addition, the United States Court of Appeals for the Federal Circuit has held that plaintiffs' claims should reflect consideration of each claim period on its own.  Gov't Post Tr. Resp. at 23 (citing *Ind. Mich.*, 422 F.3d at 1376-78; *Yankee Atomic*, 536 F.3d at 1282).  Therefore, all payments and refunds recorded from January 1, 2010 to June 30, 2015, should be included in the court's award of damages for that period.  Gov't Post Tr. Resp. at 23.  SMUD's accounting system recorded ANI refunds as credits for the year that they were received.  Gov't Post Tr. Resp. at 23.  But, SMUD's damages claim does not reflect the full amount of those refunds.  Gov't Post Tr. Resp. at 23.  Accordingly, "SMUD overstated the cost it incurred between January 2010 and June 2015 for ANI nuclear liability insurance . . . and [] should not be permitted to recover those costs."  Gov't Post Tr. Resp. at 23.

### c.      SMUD's Reply.

SMUD replies that ANI refunds "reduce the net cost of insurance in the year the premium was paid, not the year the refund was paid."  Pl. Post Tr. Reply at 17–18 (citing PX 33 at 111–12).  In fact, ANI distributes refunds on a pro rata basis only to those entities that paid a reserve premium ten years before distribution.  Pl. Post Tr. Reply at 18 (citing PX 33 at 112, PC 32.002).  Therefore, the refunds paid to SMUD from 2009 to 2014 correspond to costs incurred between 2000 and 2004.  Pl. Post Tr. Reply at 17.  But, SMUD's damages for the 1992–2004 claim period have already been litigated in Civil Action Docket No. 98-488C.  Accordingly, the court cannot award an offset that corresponds to that claim period.  Pl. Post Tr. Reply at 19.

### d.      The Court's Resolution.

In cases arising out of DOE's partial breach of the Standard Contract, plaintiffs must litigate damages in successive suits.  *See Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1376–78 (Fed. Cir. 2005).  This litigation structure limits plaintiffs' ability to collect future damages.  *Id.*  In *SMUD IX*, the United States Court of Appeals for the Federal Circuit held that "this precedent also limits [the Government's] ability to obtain future offsets."  *SMUD IX*, 566 F. App'x at 996 (citing *Indiana Michigan Power*, 422 F.3d at 1377)).  Our appellate court also ruled that an order staying judgment in one damages period, pending an offset determination related to a later damages period, constituted a constructive award of future offsets.  *Id.*

SMUD argues that the Government's claimed offset is prohibited by *SMUD IX*, because "it seeks to take costs from one period . . . and use them against SMUD in the later period."  Pl. Post Tr. Br. at 30.  But, the appellate court's holding in *SMUD IX* is based on the principle that the Government cannot recover *future offsets*.  *See SMUD IX*, 566 F. App'x at 996 (emphasis added).  In this case, the Government is seeking an offset that was realized in the current damages period, although it related to damages incurred prior to this period.

For these reasons, the court has determined that the Government is entitled to a $682,397 offset for ANI insurance refunds that SMUD received between 2010 and 2015.

### III.   CONCLUSION.

For these reasons, the court has determined that SMUD is entitled to $28,867,161 in damages to mitigate the Government's partial breach of the Standard Contract from January 1, 2010 to June 30, 2015.   Accordingly, SMUD's July 29, 2016 Motion For Partial Summary Judgment, pursuant to RCFC 56(a), is moot.   The Clerk of the United States Court of Federal Claims is directed to enter final judgment in accordance with this Memorandum Opinion and Final Order.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**
